# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO. 4:11-CV-00033-JHM**

**CINDY JIMENEZ, Administratrix of the**
**Estate of TYLER BUTLER, deceased,**                                    **PLAINTIFFS**

**V.**

**HOPKINS COUNTY, KENTUCKY, et. al.**                                    **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendants, Southern Health Partners, Inc., Henry Davis, M.D., Candace Moss, Renee Keller, Betty Dawes, and Angela Pleasant ("SHP Defendants"), for summary judgment [DN 76]; on a motion by Defendants, Hopkins County, Joe Blue, Jeremy Witherspoon, Teressa Kreitler, Angela Peterson, Eric Poe, Diana Potocnick, and Jessica Bennett ("County Defendants"), in their individual and official capacities, for summary judgment [DN 77], and on a motion by Plaintiff, Cindy Jimenez, Administratrix of the Estate of Tyler Butler, for a hearing on the motions for summary judgment [DN 106]. Fully briefed, these matters are ripe for decision.

### I. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U .S. 242,

247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." <u>Anderson</u>, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

## II. BACKGROUND

Plaintiff, Cindy Jimenez, Administratrix of the Estate of Tyler Butler, brings this action pursuant to 42 U.S.C. § 1983 alleging that the Defendants violated Butler's rights under the Eighth, Tenth, and Fourteenth Amendment to the Constitution of the United States by acting with deliberate indifference to his serious medical needs while he was an inmate in the Hopkins County Detention Center ("HCDC or Jail").  Plaintiff also asserts state law claims for negligence, gross negligence, and the tort of outrage arising from the same conduct.

HCDC contracted with Southern Health Partners ("SHP") to provide medical services for its inmates.  SHPS separately contracted with Dr. Henry Davis to act as HCDC medical director. Davis was not a SHP employee.  SHP employed nurses and other medical personal at HCDC.  In April of 2010, SHP employed Candace Moss, LPN; Betty Dawes, R.N.; Angela Pleasant, LPN; and Renee Keller, LPN.

## A. Thursday, April 8, 2010

On Thursday, April 8, 2010, at 4:57 p.m., Tyler Butler (hereinafter "Butler") surrendered himself at HCDC to serve a scheduled sentence for assault. Upon his arrival at the Jail's intake area, Deputy Jailer Sherry McDowell, who was working the control tower, buzzed him through the outer door of the facility into a receiving area, where he was met by Deputy Jailer Rodney Knox. Knox escorted Butler into the facility's booking area. Knox took Butler to a section of the booking area to be fingerprinted. During this procedure, Butler vomited into a trashcan. Knox placed Butler into a diversion cell directly across from the booking desk to await booking. Knox informed his shift supervisor, Deputy Jailer Carl Coy, and Defendant Deputy Jailer Angela Peterson that Butler had vomited.

Peterson served as Butler's booking officer. Peterson testified that Butler communicated to her that he was late for his intake because he had to walk to the Jail from his father's home in Madisonville because he could not find a ride. Peterson indicated that Butler was sweating profusely when she first saw him. Peterson further testified that she was alerted by the control tower operator Sherry McDowell that Butler appeared to have swallowed something as he stood at the booking window. Peterson indicated that Butler's condition noticeably deteriorated between the time of his arrival and the time he was brought into the booking area of the Jail to be processed. According to Peterson,

> From the time that he walked in the door, he – I mean, he was really sweaty, but he could actually speak to me. He got to where he could barely even stand up outside. Almost like he was under the influence of something. He could not hardly stand up outside. His eyes was like almost closed, where he was like this (indicating). I mean, like he was really squinting to see.

(Angela Peterson Dep. at 9.) During Butler's medical interview at booking, Butler indicated that he suffered from gout, high blood pressure, rheumatoid arthritis, osteoporosis, and methicillin-

resistant staphylococcus aureus ("MRSA"). Butler also reported that he was taking Prednisone, Seroquel, Allopurinol, and Colchicine and that he had been treated recently for depression. Finally, Peterson testified that Knox reported that Butler had vomited twice.

Based on Butler's responses to the questions and his physical appearance, Peterson testified that she was very concerned and wanted to refuse his admission to the jail. Peterson testified that she did not know if she had authority to refuse a scheduled intake. Peterson contacted her shift supervisor, Deputy Jailer Coy, for instructions. Coy instructed her to contact HCDC's medical department because "it was medical's call." (Id. at 11.) HCDC's Policy 4.1.2 provides that "[o]nly Medical has authority to refuse intakes for health reasons." (DN 101-4.)

Acting at Coy's direction, Peterson contacted the medical department. Defendant Candace Moss, a SHP employee and an LPN, came to the booking area to examine Butler. Both Moss and the president of SHP, Jennifer Hairsine, testified that an LPN could not diagnose medical conditions nor administer medications without physician approval. Moss testified that at the time she examined Butler she was aware that she was going to make a decision as to whether to authorize or deny Butler's admission to the facility. Peterson testified that she informed Moss of Butler's medical conditions and medications that he had indicated he was taking on admission to the HCDC. According to Moss, Butler reported to her that he had frequent staph infections, currently had a staph infection in his groin area, had been vomiting recently, had not seen a doctor for the staph infection, and had a rash of unknown origins. Moss testified that she did not conduct a physical exam of Butler, take his vital signs, or consult with HCDC's medical director. Moss directed the staff to admit Butler to HCDC to serve his sentence.

Based on the deputy jailers' reports of suspected drug use and Butler's report of a possible staph infection, Moss placed Butler in a 72-hour detox as a precaution. SHP Policy

requires that an Alcohol/Drug Withdrawal Flow Chart be prepared for all inmates placed on a 72-hour detox protocol. The chart requires that inmate's vital signs are taken twice a day. Because Moss was at the end of her shift, she did not prepare a chart. Moss testified that she assumed that incoming SHP employee Andy Johnson would start the flow sheet. The record reflects that an Alcohol and Drug Detox Flow Sheet was not prepared. Butler was housed in a detox cell on HCDC's "100 walk."

### B. Friday, April 9 and Saturday, April 10

Surveillance logs for the 100 walk reflect that HCDC staff monitored Butler at 20-minute intervals throughout his time in that cell as required by HCDC policy and Kentucky Administrative Regulations. According to the County Defendants, none of the deputy jailers who monitored Butler during those two days or accompanied a SHP nurse on "med pass" noted or were informed by Butler that he was suffering from any "acute distress," instead they only noticed that Butler's rheumatoid arthritis made it difficult for Butler to move around. Butler's medical records reflect that his blood pressure was taken by SHP LPN Andy Johnson on April 9, 10, and 11. However, Johnson testified that he does not remember ever touching Butler. No time is specified in the blood pressure record, and there is no other record of any of Butler's other vital signs being taken, or of his appearance, signs, or symptoms. Additionally, the medication administration record (MAR) indicates that Butler was administered Allopurinol, Prednisone, and Quetiapine on April 9, 10, and 11. However, in its written verified responses to discovery, SHP stated that the medical records reflect that Butler received no medication. (DN 101-12.) Further, the record reflects that the medication in question was not prescribed or authorized by Dr. Davis.

Brad Foster, a fellow inmate, testified that he saw Butler on Friday, August 9, when he

was handing out dinner trays. Foster testified that he informed a deputy jailer that Butler could not get his tray and the deputy opened the door to allow Foster to give the tray to Butler. Foster testified that he notified the deputy that Butler needed a nurse or doctor because he could tell he was in pain. Additionally, Foster testified that when he entered his room to give him his tray, he could smell urine and feces.

Deputy Jennifer Chambers testified that on Saturday, August 10, she informed Deputy Rodney Knox that Butler had requested a sick-call slip and Knox indicated that he would get Butler one. Chambers indicated that although she wasn't a medical professional, she believed Butler had a need for outside medical care and was at an obvious risk of serious harm. She testified that she would have sent Butler to the hospital, but that she did not have the authority to do so. Chambers further testified that she had never seen anybody in the jail in Butler's condition. Chambers testified that during her shift, Knox indicated to her that Butler did not look good, that Knox had called for medical but they hadn't "came up there yet," and that Knox appeared frustrated and upset that medical had not come to see Butler. Prior to the end of her shift, Deputy Knox communicated to Chambers that someone from medical came up to Butler's cell.

### C. Sunday, April 11

On Sunday, April 11, Deputy Jailer Brandon Lampton started his shift at 6:00 a.m. Among his regular duties, he was assigned the 100 walk observations. Lampton testified that when he first saw Butler, he was sitting on the floor of the cell with his feet straight out in front of him and his back against the wall directly in front of the cell door's window. According to Lampton, he wasn't aware of the reason Butler was in the detox cell, but he assumed it was for medical because it was obvious that he had some issues. Lampton testified that Butler had very

limited mobility, his joints were swollen and red, and Lampton could "tell he was hurting." Lampton testified that he asked Butler if he was alright and Butler indicated he was fine. Lampton further testified that he asked Butler what was wrong with him and Butler indicated he had rheumatoid arthritis.

On Lampton's third or fourth time through the walk, Butler asked him for a new uniform because he had used the bathroom on himself. Butler informed Lampton that he couldn't stand up and that he had defecated on himself because he couldn't get to the toilet. With the help of Deputy Jailer Stephen O'Reilly, Lampton picked Butler up and helped him into the restraint chair, which was used to transport Butler to the shower. Lampton testified that the officers helped Butler remove his clothes and then sat him in a plastic chair in the shower to wash off. Lampton stayed with him because he was concerned he might fall out of the chair. While in the shower area, Butler requested to use the restroom. Lampton and another deputy helped him to the toilet. Officers then helped Butler get dressed and transported him back to his cell. Lampton testified that he never observed a nurse visit Butler in the shower area or at any time while Butler was on the 100 walk. Similarly, Deputy Jailer Stephen O'Reilly does not remember a nurse being there while they were helping Butler in the shower area.

Within 10 to 20 minutes after returning Butler to his cell, Lampton went to the medical office and informed the nurse on duty what had happened, including that Butler had defecated on himself. Lampton testified that the nurse indicated that she was aware of the situation. Lampton does not recall who was working in the medical office, but it is undisputed that the only nurse at HCDC that morning was Defendant, Renee Keller, LPN.

About an hour or so later, Butler defecated on himself again. Lampton believed that Butler had diarrhea. Lampton testified that he asked if Butler wanted another shower, and Butler

said no.  Lampton provided Butler with another uniform and then Lampton went to the medical office again.  Lampton testified that he chose to return to the medical office to tell them his opinion on how to make the situation a little better for Butler.  "[I]t was obvious he couldn't get off the floor . . . .  So I told them . . . [t]he 500 walk cell has got a bunk.  They're at least 18 inches or 20 inches off the ground and they're about level with the toilet, you know, so I figured it would be easier for him to be able to rotate himself over or get to a standing position from a sitting up position . . . ."  (Brandon Lampton Dep. at 44-45.)  Lampton testified that the nurse was aware that Butler had defecated on himself twice.  Medical approved the move, and Lampton and another officer moved Butler to the 500 walk.  Lampton had no other contact with Butler.

Defendant LPN Renee Keller, the nurse on duty on April 11, testified that she was informed by Lampton that Butler had used the restroom on himself because he had problems getting up and down off the floor to get to the toilet.  Keller testified that she observed Butler in the shower room where he informed her that he did not need anything and that he was just hurting in his arm and ankle from rheumatoid arthritis.  According to Keller, he did not appear to be in distress.  Keller testified that she helped him put his shirt on at which time he did not appear to be running a fever.  Keller did not take his vital signs, including his rate of respiration, temperature, or heart rate.  Additionally, Keller indicated she wasn't aware of SHP policy on the whether to take vitals of an inmate in such a situation.  She further testified that she approved Butler's move from detox to medical isolation where he would have available a bed.

After Butler was removed to the 500 walk, Defendant Deputy Jailer Jessica Bennett made rounds in the 500 walk until 12:11 p.m., according to the observation logs.  Bennett did not enter any of the cells on her rounds and cannot recall having any conversation with Butler.  Bennett

testified that she did recall Butler being transported to the 500 walk in a restraint chair.

Similarly, Defendant Deputy Jailer Diana Potocnick saw Butler when he arrived in the 500 walk. Potocnick testified that she believed that Defendant Deputy Jailer Eric Poe transported him to the 500 walk. Potocnick stated that she asked Poe what the situation was and Poe informed her that Butler was unable to get up off the floor in detox so they moved him to segregation so it would be easier for him. Poe informed her that Butler had defecated on himself. The observation log indicates that Potocnick checked Butler after his move to the 500 walk five times. She testified that she never opened Butler's cell or communicated with him.

The observation log indicates that Defendant Deputy Jailer Eric Poe checked Butler once at 12:22 p.m. Poe testified that he accompanied other deputies throughout the day to do checks. Contrary to Potocnick's statement, Poe doesn't recall being one of the deputy jailers who took Butler to his cell. Poe testified that during a security check an hour before Butler was found unresponsive, Butler asked Poe for a glass of water. Poe did not enter Butler's cell; instead he told Butler no, that he had water in the cell, and walked away.

Defendant Deputy Jailer Teresa Kreitler's initials appear in the observation log on 11 occasions prior to Butler's death. Kreitler testified that within an hour of Butler being found nonresponsive he had asked her for water. Kreitler stated that she could not hear what he was saying so she opened the door. She testified that she told him to get the water out of the faucet, but Butler informed her he couldn't get up because of his rheumatoid arthritis and gout. Kreitler stated that she told Butler she would check on getting him a cup of water.

### D. Butler's Death

On another round check, Kreitler passed Butler's cell and noticed Butler was lying awkward on his bed. She entered the cell, shook him, he made no response. She checked for a

pulse, but felt none.  When she touched him, he was cold.  LPN Keller was notified at 4:19 p.m. by the staff that Butler had been found non-responsive in his cell.  Keller testified that when she arrived at his cell, Butler was bluish and gray in color, he had no pulse, and was cold.  No attempt to revive him was made.  The coroner arrived at 4:40 p.m. and pronounced Butler dead.

An autopsy was performed at the Western Kentucky Regional Medical Examiner's Office on April 12, 2010, by Dr. Deirdre Schuluckebier.  Her final diagnoses provided that the "[d]eath in this 25-year-old man, Tyler Butler, is attributed to findings consistent with sepsis. Obesity with hypertension, rheumatoid arthritis and coronary atherosclerosis are considered significant coexisting conditions." (Schuluckebier Report at 1, DN 77-19.)

### III. FEDERAL CLAIMS

As an initial matter, the SHP Defendants move for summary judgment in favor of Defendant, Henry Davis, M.D., noting that the parties have stipulated to Dr. Davis' dismissal on August 30, 2013, but no final order was entered.  The record reflects that Dr. Davis was dismissed by Order of the Court on September 4, 2013. [DN 78].  Additionally, in response to the motions for summary judgment by both the SHP Defendants and the County Defendants, Plaintiff states that she has no objection to the dismissal of her claims against Defendants Betty Dawes, Joe Blue, and Angela Peterson.  Likewise, Plaintiff states that she has no objection to the dismissal of her claims brought pursuant to the Tenth Amendment and Fourteenth Amendment.

Plaintiff's federal claims for damages arise under 42 U.S.C. § 1983 which states in part that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law. . . .

42 U.S.C. § 1983. To state a claim under § 1983, a plaintiff must establish both that 1)he "was deprived of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001) (citation omitted). Plaintiff contends that the Defendants violated Butler's Eighth Amendment rights.

The Eighth Amendment imposes a duty upon prison officials to provide humane conditions of confinement. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). Prison officials must "ensure that inmates receive adequate food, clothing, shelter, and *medical care*, and must 'take reasonable measures to guarantee the safety of the inmates.'" Id. at 832–33 (citation omitted) (emphasis added). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." Id. at 828.

To establish an Eighth Amendment violation premised on inadequate medical care, a prisoner must demonstrate that the defendant acted, or failed to act, with "deliberate indifference to serious medical needs." Id. at 835 (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)); Terrance v. Northville Reg'l Psychiatric Hosp., 286 F.3d 834 (6th Cir. 2002). To rise to the level of an Eighth Amendment violation, a prison official must "know[] of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837–38. In other words, to establish that a prison official, in his individual capacity, was deliberately indifferent to an inmate's serious medical needs, the plaintiff must establish two elements. See Comstock v. McCrary, 273 F.3d 693, 702–03 (6th Cir. 2001). The first element is an objective element, which requires a plaintiff to show that the inmate's medical needs were "sufficiently serious." Id. (citing Farmer, 511 U.S. at 834). The

second element is a subjective element, which is satisfied if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "Complaints of malpractice or allegations of negligence are insufficient to entitle a plaintiff to relief." Lewis v. McClennan, 7 Fed. Appx. 373, 375 (6th Cir. 2001) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). Furthermore, "[a] prisoner's difference of opinion regarding treatment does not rise to the level of an Eighth Amendment violation, . . . and, where the prisoner has received some medical attention and now disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law." Id. (citing Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976)) (internal citation omitted). However, "a prisoner who is needlessly allowed to suffer pain when relief is readily available does have a cause of action against those whose deliberate indifference is the cause of his suffering." Westlake, 537 F.2d at 860.

### *Objective Component*

The objective component requires the existence of a "sufficiently serious" medical need. Id. "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008)(quoting Blackmore v. Kalamazoo County, 390 F.3d 890, 897 (6th Cir. 2004)).

Both rheumatoid arthritis and a MRSA infection unquestionably are serious medical conditions. Gaines v. Armor Health Care, Inc., 2013 WL 6410311, *5 (E.D.N.Y. Dec. 9, 2013). See also Nelson v. Putnam County Justice Center, 2013 WL 1623686, *3 (M.D. Tenn. April 15,

2013); <u>Gurule v. Hanlin</u>, 2013 WL 5774131, *4 (D. Or. Oct. 21, 2013). Additionally, Butler had a serious medical need obvious even to a layperson. The facts in the light most favorable to the Plaintiff demonstrate that laypersons believed Butler needed medical attention. For example, on April 9, 2010, Deputy Jailer Peterson did not want to admit Butler to the jail because of his condition -- vomiting, sweating profusely, and having trouble walking, talking, and standing; Brad Foster testified that when he observed Butler on April 10, 2010, Butler could not move, could not reach the toilet or eat, was urinating and defecating on himself, and needed a doctor; and Deputy Jailers Knox and Chambers testified that they believed Butler needed medical attention and requested it. <u>See also</u> <u>Taylor v. Franklin County, Ky.</u>, 104 Fed. Appx. 531, 538 (6th Cir. 2004)(recognizing that signs of reoccurring incontinence and debilitating immobility were clear symptoms of a serious problem); <u>Phillips v. Roane County, Tenn.</u>, 534 F.3d 531, 540 (6th Cir. 2008). Based on this testimony, the Court finds these "facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." <u>Blackmore</u>, 390 F.3d at 898. Thus, Plaintiff has produced sufficient evidence to demonstrate the objective element of her deliberate indifference claim against the individual defendants.

### *Subjective Component*

To fulfill the subjective component, an inmate must "'show that prison officials have a sufficiently culpable state of mind in denying medical care.'" <u>Ham v. Marshall County, Ky.</u>, 2013 WL 6017441, *5 (W.D. Ky. Nov. 13, 2013)(quoting <u>Blackmore</u>, 390 F.3d at 895). "Although deliberate indifference requires a mental state more culpable than mere negligence, the official need not have acted with the purpose of causing harm or knowing that harm will result." <u>Id.</u> Rather, "the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference. Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." Id. at *5 (quoting Blackmore, 390 F.3d at 896 (internal citations and quotations omitted)). See also Smith v. County of Lenawee, 505 Fed. Appx. 526, 532 (6th Cir. 2012).

## A.  INDIVIDUAL LIABILITY

### 1. Claims of Deliberate Indifference against the SHP Nurses

At the outset, it is important to specify that the question is not whether Nurse Moss, Nurse Keller, or Nurse Pleasant is liable for failing to recognize that Butler was septic or had myocarditis.  "[A] LPN is not authorized to make a diagnosis. However, a LPN, and especially a LPN who is the sole gatekeeper for access to a physician, must be able to know when there is a risk of a serious condition that requires additional care."  Rodrigue v. Morehouse Detention Center, 2012 WL 4483438, *6 (W.D. La. Sept. 28, 2012).

### a.  LPN Candace Moss

A reasonable jury could find that Moss had direct, personal knowledge of Butler's serious medical need the afternoon of April 9 and disregarded the risk. The record reflects when Butler presented at HCDC to serve his scheduled sentence, Butler was sweating profusely, vomiting, and having difficulty standing.  He reported that he suffered from gout, high blood pressure, rheumatoid arthritis, osteoporosis, and MRSA; that he currently had a staph infection in his groin; and that he had a rash of unknown origins.   In fact, based on Butler's responses to the questions and his physical appearance, Deputy Jailer Peterson testified that she was very concerned and wanted to refuse his admission to the jail.  However, as required by HCDC Policy, Peterson contacted HCDC's medical department because medical could only refuse an

intake.

After being informed of Butler's medical conditions and his current medication, Moss interviewed Butler. Deputy Chambers testified that Moss also observed some open wounds on Butler and witnessed him vomit. Despite the information discussed above, Moss failed to conduct a physical exam of Butler, take his vital signs, or consult with HCDC's medical director. Instead, Moss directed the staff to admit Butler to HCDC to serve his sentence. Moss placed Butler in a 72-hour detox as a precaution due to suspected drug use and Butler's reports of possible staph infection.

Significantly, SHP Policy J-G-06 provides that "[d]etoxification will be carried out only under medical supervision and initiated by the medical staff with physician overview on an individual care basis." (SHP Policy, Intoxication and Withdrawal, J-G-06, DN 101-5.) SHP's President testified that it is a requirement of SHP that the nurse contact the medical director if an inmate is going to be placed in detox and administered medicine. (Hairsine Dep. at 74.) In fact, the policy provides that "[a]ll detainees found to be demonstrating the signs and symptoms of drug/alcohol withdrawal will either be seen or reviewed by the Medical Director and his ordered care treatment plan will be followed." (SHP Policy, J-G-06, DN 101-5.) SHP Policy J-G-06 also provides that "[d]etox inmates must be monitored on a consistent basis and all findings charted in his/her medical record. Documentation of the patient's status during detoxification is very important and must be reviewed by all medical staff members when needed in order to maintain patient care while incarcerated. Use the Alcohol and Drug Detox Flow Sheet." (Id.) Thus, at a minimum, SHP Policy requires that an Alcohol/Drug Withdrawal Flow Chart be prepared for all inmates placed on a 72-hour detox protocol. The flow chart requires that inmate's vital signs are taken twice a day. While Moss placed Butler in detox, Moss failed to prepare the Alcohol and

Drug Detox Flow Sheet.  This failure is in direct violation of SHP's policy.  See also Harris v. City of Circleville, 583 F.3d 356, 369 (considering a defendant's failure to follow policy as evidence that the subjective prong of a deliberate indifference claim had been satisfied). Furthermore, even SHP's regional administrator, Betty Dawes, testified that Moss should have at the minimum prepared a drug and alcohol withdrawal flow sheet, document Butler's vital signs, his state of restlessness and confusion, including her reasons for placing him in detox.  (Dawes Dep. at 27.)

Additionally, SHP Policy also requires that "[a]ll inmates undergoing intake screening and physical exams should be carefully evaluated for skin infections." (SHP's Policy, Practice Guidelines for the Management, Identification, and Treatment of Staph Infections, Suspected MRSA Infections, and MRSA Infections, DN 101-8.)   SHP policies further require an examination of the skin infections, culturing of draining wounds, treatment while awaiting culture results, and documentation of the examination using the SHP Wound Care Flow Sheet. (Id.)   It is undisputed that Moss did not conduct a physical exam of Butler, including an examination of his groin area where the reported staph infection was located.

Plaintiff's nursing expert, Madeleine LaMarre, opined that at the time of Butler's arrival, given his condition, Moss should have immediately performed an intake medical screening that included vital signs and physical examination to assess the severity of his medical condition and to make a determination whether Butler could safely be admitted to the jail or required immediate referral to a physician or emergency department.  (Madeleine LaMarre Report at 4-5, DN 81-1.)   LaMarre further opined that "[b]y not performing an intake screen, ensuring continuity of prescribed medication, assessing his systems related to a groin infection, or performing nursing assessments of the patient who was presumed to be withdrawing from drugs

or alcohol, LPN Moss . . . did not meet generally accepted standards of nursing practice and [was] not in compliance with SHP policies and procedures regarding receiving screening, practice guidelines for MRSA infection, and intoxication and withdrawal and special needs treatment plan." (Id. at 5.)

Further, LPN Keller testified that when an inmate reports he has MRSA, the medical staff must report to all staff that the inmate has MRSA to protect themselves and other inmates. (Keller Dep. at 36.)

Given Butler's reported condition at intake and the fact that Moss interviewed him, there are sufficient facts to demonstrate that Moss was aware of facts from which it could be inferred that a substantial risk of serious harm existed, and that she did in fact draw that inference. Additionally, based on her violation of SHP policies and the testimony of Dawes, Hairsine, and Expert LaMarre, a reasonable jury could conclude that LPN Moss disregarded that risk by not conducting an intake medical screening including a physical examination and vital signs, by admitting Butler to the jail despite his medical symptoms, and by not preparing an Alcohol and Drug Detox Flow Sheet. Therefore, Moss's motion for summary judgment in her individual capacity as to the deliberate indifference claim is denied.

### b. LPN Renee Keller

Likewise, a reasonable jury could find that Keller had direct, personal knowledge of Butler's serious medical need the morning of April 11 and disregarded that risk. Keller testified that when she began her 6:00 a.m. shift, she reviewed the inmates that were in detox and cleared Butler from detox. Keller stated in her report that "[i]nmate to remain in medical isolation . . . related to inmate . . . stating, staph on groin area. Inmate to remain in isolation until cleared by medical." (Keller Dep. at 42.) Thus, the record reflects that Keller was aware as early as 6:18

a.m. that Butler had stated at intake that he had a staph infection in his groin area. Deputy Jailer Lampton testified that he informed Keller of Butler's condition of incontinence with severely limited mobility, but Keller did not do anything. Lampton testified while Keller approved of Butler's removal from the 100 walk at Lampton's request, Keller did not visit Butler in the shower room. Even if the Court accepts Keller's claim that she visited Butler in the shower room, the record reflects that despite her knowledge of his incontinence, hot and swollen joints, extremely limited mobility, and possible staph infection in groin, Keller testified that when called to the shower because Butler had defecated on himself, she did not examine the groin area, ask any questions about it, ask whether he was having any other symptoms like diarrhea or vomiting, did not take his vital signs, and did not contact the physician. (Keller Dep. at 43.)

SHP's regional administrator Betty Dawes testified that if Keller was informed that Butler had defecated on himself, SHP policies required Keller to at least go see him, take his vitals, and document not only his vitals but her observation of his condition. (Betty Dawes Dep. 35-36.) Dawes also testified that SHP's policies required Keller to telephone Dr. Davis when she learned that Butler could not get off the floor. (Id. at 39-40.) See also Harris v. City of Circleville, 583 F.3d 356, 369 (6th Cir. 2009) (considering a defendant's failure to follow policy as evidence that the subjective prong of a deliberate indifference claim had been satisfied).

"This is not a case where an inmate saw a physician and that physician made an unfortunately incorrect medical decision." Rodrigue, 2012 WL 4483438, *6. Instead, in the present case, despite reports of multiple occasions of incontinence, hot and swollen joints, and extremely limited mobility, and in violation of SHP policies, Keller conducted no physical exam, did not record Butler's vital signs, and did not contact the physician. Butler "was simply denied access to a medical professional competent to diagnose and treat his condition." Id. When a

gatekeeper to emergency care knowingly disregards a prisoner's symptoms, "she acts with deliberate indifference to that prisoner's medical needs." <u>Id.</u> In response to his medical symptoms, Keller did nothing for Butler other than approve his movement from a detox cell to a medical cell where he would continue to be observed every 15 to 20 minutes by deputy jailers. On these facts, a reasonable jury could find that Keller was aware of a serious risk to Butler's health and safety and disregarded that risk. <u>See also</u> <u>Hamilton v. Pike County, Ky.</u>, 2013 WL 529936, *11 (E.D. Ky. 2013)(denying summary judgment where a fact-finder could find that the doctor knew of a serious medical risk – the inmate's inability to walk – and disregarded that risk by prescribing a multivitamin). Therefore, Keller's motion for summary judgment in her individual capacity as to the deliberate indifference claim is denied.

### c. LPN Angela Pleasant

Plaintiff seeks to hold Angela Pleasant liable based on her supervisory position as SHP Medical Team Administrator at the Jail. "[L]iability of supervisory personnel must be based on more than merely the right to control employees." <u>Hays v. Jefferson County, Ky.</u>, 668 F.2d 869, 872 (6th Cir. 1982). "Because § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor to incur personal liability." <u>Miller v. Calhoun County</u>, 408 F.3d 803, 817 n.3 (6th Cir. 2005). To establish supervisory liability in a § 1983 action, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984) (citing <u>Hays</u>, 668 F.2d at 872–74). It is undisputed that Pleasant had no interaction with Butler between April 8, 2010, and April 11, 2010.

Additionally, Pleasant testified that she was out of town while Butler was incarcerated. As such, Plaintiff has failed to allege any evidence that Pleasant authorized, approved, or knowingly acquiesced in Moss and Keller's treatment of Butler. Therefore, Pleasant's motion for summary judgment in her individual capacity as to the deliberate indifference claim is granted.

### 2. Claims of Deliberate Indifference against the Deputy Jailers

As discussed above, it is important to specify that the question is not whether the deputy jailers knew that Butler suffered from sepsis or myocarditis. Instead, regardless of which condition caused Butler's death, a deputy jailer must be able to recognize when there is a risk of a serious condition that requires additional care. See, e.g., Rodrigue, 2012 WL 4483438, *6.

#### a. Jeremy Witherspoon

On April 11, Deputy Jailer Jeremy Witherspoon was the shift supervisor at HCDC. Witherspoon testified that his first contact with Butler occurred when one of the deputy jailers contacted Witherspoon and informed him that Butler did not make it to the bathroom. Witherspoon testified that he contacted LPN Keller and requested to move Butler to a different cell to get him off of the floor. Witherspoon stated that Keller indicated that Butler had been cleared from detox, and he could go to a segregation cell. (Jeremy Witherspoon Dep. at 19-20.) Witherspoon further testified that Keller informed him that Butler had rheumatoid arthritis. According to Witherspoon, he was aware that Butler was having difficulty walking, but had not been told he had MRSA. After placing Butler in his cell, Witherspoon continued his duties as shift supervisor and had no further contact with Butler until the red flag alarm had been called.

Plaintiff has failed to demonstrate that Witherspoon acted unreasonably under the circumstances. Unlike the other deputy jailers discussed below, Witherspoon notified medical regarding Butler's condition. He informed medical that Butler had defecated on himself because

he was unable to get to the toilet. Upon speaking to LPN Keller, Witherspoon was informed that Butler suffered from rheumatoid arthritis, he had been released from detox, and could be moved to medical segregation which contained a bed at the same height as the toilet. Considering his contact with medical, Plaintiff has failed to demonstrate that Witherspoon acted with deliberate indifference to Butler's medical needs. For these reasons, Witherspoon's motion for summary judgment on Plaintiff's deliberate indifference claim is granted.

### b. Jessica Bennett

According to the observation logs, Defendant Deputy Jailer Jessica Bennett made multiple rounds in the 500 walk until 12:11 p.m. on Sunday, April 11. Bennett did not enter any of the cells on her rounds and cannot recall having any conversation with Butler. Bennett testified that she did recall Butler brought to the 500 walk in a restraint chair, assumed he was there for medical reasons, and assumed he was having problems walking.

The facts in light most favorable to Plaintiff demonstrates that Brad Foster, Chambers, and Knox testified that Butler did not look good and that Butler needed medical care; that Butler's condition did not improve from Saturday, but in fact worsened throughout the day on Sunday; that Bennett was aware that Butler was in the 500 walk for a medical reason and that Butler had trouble walking. Nevertheless, Bennett did not enter Butler's cell and did not even attempt to engage Butler in conversation. On these facts, a reasonable jury could find that Bennett was aware of a serious risk to Butler's health and safety and disregarded that risk by failing to do more than passively look into Butler's cell and check that she had made her rounds. Thus, Bennett's motion for summary judgment in her individual capacity as to the deliberate indifference claim is denied.

**c. Diana Potocnick**

Defendant Deputy Jailer Diana Potocnick saw Butler when he arrived in the 500 Walk on Sunday, April 11.  Potocnick stated that she asked Deputy Jailer Poe about Butler and was informed that Butler was unable to get up off the floor in detox so they moved him to segregation so it would be easier for him.  Poe informed her that Butler had defecated on himself.  Potocnick testified that she assumed Butler was having trouble walking.  The observation log reflects that Potocnick checked Butler after his move to the 500 walk five times at 1110, 1126, 1154, 1255, and 1436.  She testified that her conversation with Poe occurred prior to her observation rounds.  Further, she testified that with any security check at the jail she does, as long as the inmate is breathing or moving, there is no cause for concern.  According to Potocnick, she never opened Butler's cell or communicated with him. She testified that she did not talk to anyone at medical about Butler because she "figured it was being handled."  (Diana Potocnick Dep. at 17.)

Where officers are aware that an inmate is exhibiting severe symptoms, there exists a "a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage [the inmate] verbally or entered his cell."  Finn v. Warren County, Ky., 2012 WL 3066586, *10 (W.D. Ky. July 27, 2012)(citation omitted).  In the instant case, the record reflects that Potocnick knew Butler was having trouble walking and that he was incontinent.  Additionally, Foster, Chambers, and Knox testified regarding Butler's condition on Saturday.  The evidence in the light most favorable to Plaintiff demonstrates that Butler's condition did not improve, but in fact worsened throughout the day on Sunday.  Nevertheless, Potocnick did not enter Butler's cell and did not even attempt to engage Butler in conversation.  Considering Potocnick's testimony regarding her perceived role in observing inmates on medical segregation, coupled with the facts above, a reasonable jury

could find that Potocnick was aware of a serious risk to Butler's health and safety and disregarded that risk by failing to do more than passively look into Butler's cell and check that she had made her rounds. Thus, Potocnick's motion for summary judgment in her individual capacity as to the deliberate indifference claim is denied.

### d. Eric Poe

Deputy Jailer Potocnick testified that Deputy Jailer Poe was one of the deputy jailers who transported Butler to the 500 walk on April 11. She testified that Poe informed her of the reason for Butler's placement in the 500 walk -- Butler was unable to get off the floor and Butler had defecated on himself. In contrast to Potocnick's statement, Poe doesn't recall being one of the deputy jailers who took Butler to his cell. Additionally, Poe testified that he was only aware that Butler was in the 500 walk for medical reasons, but had no knowledge of the nature of his medical problems. The observation log indicates that Poe checked Butler once at 12:22 p.m. Poe testified that he accompanied other deputies throughout the day to do checks. Further, Poe testified that during a security check an hour before Butler was found, Butler asked Poe for a glass of water. Poe did not enter Butler's cell; instead, he told Butler no, that he had water in the cell, and walked away. Poe testified that he did not try to determine why Butler was asking for a glass of water, instead of just getting up and getting it for himself.

Where officers are aware that an inmate is exhibiting severe symptoms, there exists a "a triable issue of fact about whether the guards should have contacted medical personnel in response to this problem or at least should have tried to engage [the inmate] verbally or entered his cell." Finn, 2012 WL 3066586, *10 (citation omitted). In the instant case, the evidence in the light most favorable to Plaintiff demonstrates that Foster, Chambers, and Knox testified regarding Butler's medical condition on Saturday, that Butler's condition did not improve from

Saturday, but in fact worsened throughout the day on Sunday, and Poe knew Butler was having trouble walking and that he was incontinent. Nevertheless, like Potocnick, Poe did not enter Butler's cell and did not even attempt to engage Butler in conversation. Furthermore, when Butler requested water from Poe an hour before his death, Poe summarily denied the request without entering the cell and without engaging him in further conversation, despite being aware that Butler was in medical segregation and despite his alleged knowledge of Butler's inability to walk. Deputy Jailer Potocnick even testified that if she had been the deputy jailer whom Butler informed he needed water because he could not get up to get it, she would have notified medical because he might be at obvious risk of serious harm. (Potocnick Dep. at 35-36.)

On these facts, a reasonable jury could find that Poe was aware of a serious risk to Butler's health and safety and disregarded that risk by failing to do more than passively look into Butler's cell and check that he had made his rounds. Thus, Poe's motion for summary judgment in his individual capacity as to the deliberate indifference claim is denied.

### e. Teresa Kreitler

Defendant Deputy Jailer Teresa Kreitler's initials appear in the observation log on 11 occasions prior to Butler's death. Kreitler testified that within an hour of Butler being found nonresponsive he had asked her for water. Kreitler stated that she could not hear what he was saying so she opened the door. She testified that she told him to get the water out of the faucet, but Butler told her he couldn't get up because of his rheumatoid arthritis and gout. Kreitler stated that she told Butler she would check on getting him a cup of water. Deputy Jailer Potocnick testified that at some point after the lawsuit was filed, Kreitler stated that when Butler had requested water from her, he had informed her that he couldn't walk. (Potocnick Dep. at 29-31.)

In the instant case, the evidence in the light most favorable to Plaintiff demonstrates that Foster, Chambers, and Knox testified regarding Butler's condition on Saturday; that Butler's condition did not improve from Saturday, but in fact worsened throughout the day on Sunday, and Kreitler knew Butler was unable to walk and could not reach his water. Nevertheless, despite being aware that Butler was in medical segregation, Kreitler did not report the situation to medical and not return to Butler's cell with water. As discussed above, Potocnick testified that if she had been the deputy jailer whom Butler informed he needed water because he could not get up to get it, she would have notified medical because he might be at obvious risk of serious harm. (Potocnick Dep. at 35-36.) LPN Keller testified that she relied on the deputy jailers to let her know if there is something that appears to be a significant medical problem with an inmate. (Keller Dep. at 29.) Further, Keller stated that if a jailer had been told by Butler that he could not get from his bed to the faucet in his cell to get a drink of water, the jailer should have immediately informed medical. (Id.)

On these facts, a reasonable jury could find that Kreitler was aware of a serious risk to Butler's health and safety and disregarded that risk by failing to do more than passively look into Butler's cell during the majority of cell checks, to contact medical upon learning he was unable to walk, or to return to his cell. Thus, Kreitler's motion for summary judgment in her individual capacity as to the deliberate indifference claim is denied.

## B. MUNICPAL LIABILITY

Plaintiff asserts that Hopkins County is responsible for the deliberate indifference of the SHP employees and the deputy jailers; for the custom and practice of completely deferring to the medical decisions of SHP; and for failure to train SHP nurses and the deputy jailers.

### 1. Official Capacity Claims

Plaintiff has sued the Defendants in their official capacity.  A suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent. Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Therefore, the official capacity claim against the Defendants is actually a claim against the municipality, Hopkins County. Stemler v. City of Florence, 126 F.3d 856, 864 n. 8 (6th Cir. 1997); Rothhaupt v. Maiden, 144 Fed. Appx. 465 (6th Cir. July 20, 2005).  A municipality is a "person" liable to suit under § 1983. Monell v. Department of Social Services, 436 U.S. 658, 690 (1978).

### 2. Liability for Deliberate Indifference of SHP and HCDC Employees

Plaintiff argues that Hopkins County has the primary and absolute responsibility for ensuring that inmates of HCDC receive the medical care required by Kentucky's statutes and regulations and HCDC's own policies, and are primarily liable if they fail to do so. Plaintiff contends that Hopkins County is liable for SHP employees' failure to follow SHP's own policies and procedure and for any actions or omissions of SHP employees and HCDC deputy jailers.

The Sixth Circuit has made clear that "[a] local government 'cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.'" Johnson v. Hardin County, Ky., 908 F.2d 1280, 1285 (6th Cir. 1990) (quoting Monell, 436 U.S. at 691).  To the extent that Plaintiff believes Hopkins County is liable simply because HCDC employed SHP, SHP employees, and/or the deputy jailers, and those employees may have been deliberately indifferent, Plaintiff is clearly mistaken. Hopkins County cannot be held liable for the actions or omissions of SHP staff or HCDC employees on a respondeat superior theory.

### 3. Delegation of Decision-Making Authority

Second, Plaintiff argues that Hopkins County is liable for the deliberate indifference of SHP and its employees because Hopkins County delegated final decision-making authority to SHP employees regarding medical decisions. See, e.g., HCDC Policy 4.1.2 ("[o]nly medical has authority to refuse intakes for health reasons.")  In support of this argument, Plaintiff cites Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986) and City of St. Louis v. Praprotnik, 485 U.S. 112 (1988).  The Court finds this argument unpersuasive as well.

First,  "[t]he power of an official to make final decisions regarding questions involving a particular subject matter, in and of itself, is not necessarily enough to establish a local government's liability."  Johnson, 908 F.2d at 1286.  In Johnson, the plaintiff attempted to establish municipal liability by arguing that the jailer had been delegated final decision making authority over medical decisions, and thus his decisions reflected the official policy of the municipality.  Id. at 1285–86.  The Sixth Circuit held that "in order for [the plaintiff] to prevail under this theory, he must have produced evidence from which a jury could reasonably conclude that [the defendant] was vested with final authority to set medical treatment policy for the county's prisoners."  Id. at 1286.  The Sixth Circuit found that "[a]lthough it is clear that [the defendant] applied policy by making decisions regarding [the plaintiff's] treatment, [the plaintiff] introduced no evidence that indicates [the defendant] is vested with authority to make all of the county's medical *policy* decisions."  Id. at 1287 (emphasis in original).

Thus, to prevail on this theory, Plaintiff in the instant case must produce evidence that SHP and its employees were "vested with authority to make all of the county's medical *policy* decisions."  Id.  Similar to the facts in Johnson, Plaintiff has produced evidence that SHP and its employees were the final decision-makers on medical *treatment* for the inmates at the HCDC.

However, Plaintiff has failed to produce evidence that SHP was vested with authority to make *all* of the county's medical *policy* decisions. Accordingly, Hopkins County cannot be held liable for the decisions of the SHP Defendants because those decisions do not reflect the official policy of Hopkins County.

Second, the Sixth Circuit rejected a similar argument in <u>Graham v. County of Washtenaw</u>, 358 F.3d 377 (6th Cir. 2004). In <u>Graham</u>, the Sixth Circuit held that "it is not unconstitutional for municipalities to hire independent medical professionals to provide on-site health care to prisoners in their jails." <u>Id.</u> at 384. In <u>Graham</u>, as in the present case, the Plaintiff alleged that the county defendant was liable for having a policy of deferring to the medical decisions of the private healthcare company. The Sixth Circuit "held that even if Washtenaw's policy was to defer absolutely to SecureCare employees' decisions, and even if that permitted nurses to make medical decisions that Michigan law did not permit them to make, 'those alleged defects are insufficient to hold the County liable for the alleged constitutional violation in this case.'" <u>Fisher v. County of Macomb</u>, 2011 WL 2414413, *9 (E.D. Mich. June 14, 2011.) In fact, the Sixth Circuit praised the county's policy of outsourcing the medical treatment of prisoners, finding that "most would find such a policy laudable in many respects. Not only does such a policy—like the one at issue in this case—allow prisoners to receive prompt health care from on-site doctors or nurses, it also ensures that an independent party, rather than a corrections officer, makes the critical decisions about whether and at what point a prisoner's medical needs are sufficiently severe that ambulatory care or hospitalization is warranted." <u>Graham</u>, 358 F.3d at 384.

Thus, as in <u>Graham</u> and <u>Fisher</u>, the Court finds that Hopkins County cannot be held liable for Hopkins County's policy of deferring to the medical decisions of a private healthcare

company.

### 4. Failure to Train Deputy Jailers

Plaintiff alleges that Hopkins County should be held liable for its failure to train the deputy jailers to ensure that legally mandated health care is provided. Plaintiff's specific complaint against Defendant Hopkins County is that nowhere in the policies are the deputy jailers provided any guidance as to what constitutes a "medical emergency or what to do in its event." (Plaintiff's Response to County Defendants' Motion for Summary Judgment, 23.) To succeed on a claim of failure to train, Plaintiff must establish (1) the Hopkins County training program was inadequate for the tasks the officers were required to perform; (2) the inadequacy was the result of Hopkins County's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. Russo v. City of Cincinnati, 953 F.2d 1036, 1046 (6th Cir. 1992).

The Court finds that Plaintiff has produced sufficient evidence for a reasonable jury to find that the deputy jailers received inadequate training regarding how to observe and assess inmates medical needs and respond to these needs, how to determine what medical symptoms and needs should be reported to medical, and the deputy jailer's role in observing inmates that are located both in the 26-bed medical segregation unit and the detox unit. A review of HCDC Policies provided to the Court reflect that HCDC does not have jail policies providing any guidance to deputy jailers as to what constitutes a medical emergency, what constitutes a medical symptom or condition that should be reported to medical, and what to do in the event that the medical staff does not respond. The deputy jailers testified that they had received only training in CPR and first aid. The deputy jailers further testified that when they conduct the required observation of inmates in the medical segregation unit, the deputy jailers merely check the

inmates to make sure they are breathing, moving, or not bleeding.  (See, e.g., Dep. of Potocnick at 21.)  In fact, often times the deputy jailers are not even aware of why the inmate is in medical segregation.

The County Defendants contend that HCDC's medical policy has been found to comply with all regulations of the Kentucky Department of Corrections.  County Defendants also argue that the Department of Corrections signed off on the HCDC policy manual and dictated the training each deputy jailer was required to attend. (Plaintiff's Reply at 10.)  That the deputy jailers received the bare minimum training required by the state does not mean that they received adequate training in this particular area of jail administration.  If proof of completion of state required minimum training was sufficient to defeat a failure to train claim, such claims would virtually cease to exist.  Under these circumstances, the Court finds that proof of the successful completion of state mandated training alone is insufficient to demonstrate adequate training regarding medical needs in the prison setting.  See Thomas City of Shaker Heights, 2006 WL 160303, *7 (N.D. Ohio Jan. 20, 2006)(rejecting similar argument that officers training was adequate because it was based on template provided by the state).  Considering that SHP nurses rely upon the deputy jailers to report medical needs or emergencies (Keller Dep. at 29), but that the deputy jailers receive no training regarding when to notify medical, a reasonable jury could conclude that the training in this area was inadequate to the tasks that the deputy jailers were required to perform.

Plaintiff has also produced sufficient evidence to satisfy the deliberate indifference prong. There are two situations that justify a conclusion that a municipality's failure to train was deliberately indifferent.  "One is failure to provide adequate training in light of foreseeable consequences that could result from the lack of instruction."  Brown v. Shaner, 172 F.3d 927,

931 (6th Cir. 1999). The other "is where the [municipality] fails to act in response to repeated complaints of constitutional violations by its officers." Id. Plaintiff has produced no evidence of repeated complaints regarding deputy jailers monitoring inmates in detox or medical segregation at HCDC, therefore the failure to train claim must proceed under the first scenario.

The Supreme Court has held that "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." Board of County Comm'rs v. Brown, 520 U.S. 397, 409 (1997). One example of such a circumstance is a city's failure to train its police officers in the use of deadly force, because city officials know that their officers will need to use such force when attempting to arrest fleeing felons. See City of Canton, Ohio v. Harris, 489 U.S. 378, 390 n.10 (1989). In a jail setting, the failure of a medical care provider "to train medical personnel how to deal with medical emergencies relating to diabetes could foreseeably lead to terrible consequences, including death[,]" and thus satisfied this deliberate indifference standard. Lawson v. Whitley County, 2012 WL 300617, *4 (E.D. Ky. Jan. 31, 2012).

In the instant case, the Court finds that Plaintiff has produced "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation." Brown, 520 U.S. 397, 409 (1997). The record reflects that other than CPR and first-aid training, "the County does not train officers to look for or be aware of symptoms of physical illness, how to recognize and respond to medical needs, how to document requests from inmates for medical care, or how to pass on medical concerns to jail nursing staff." See Morris v. Dallas County, 2013 WL 3014673, *20 (N.D. Tex. June 18, 2013). The jail's personnel and procedures are

structured so that the deputy jailers provide the link between inmates and medical. Id. In fact, the nurses testified that they must rely on the deputy jailers to notify medical of any significant medical problems with an inmate. (Keller Dep. at 29.) Despite this, the deputy jailers who work both the 100 walk and the 500 walk are not provided any training on how to monitor, observe, and determine potential medical needs of the inmates and how to respond to those needs. Thus, Plaintiff has produced sufficient evidence to satisfy the deliberate indifference prong.

The Court further finds that Plaintiff has produced sufficient evidence that the inadequacy of the training was related to or actually caused the injury to Butler. Because the deputy jailers "are the only persons in somewhat regular and direct contact with the inmates," and because HCDC provides no training to the deputy jailers in relation to the tasks they must perform, Plaintiff has raised a fact question whether Butler's injury "was a predictable consequence of the absence of training." Morris, 2013 WL 3014673, *20 (citing City of Canton, 489 U.S. at 390–91; Goodman v. Harris County, 571 F.3d 388, 395 (June 9, 2009); Sanders–Burns v. City of Plano, 594 F.3d 366, 381 (5th Cir. 2010). Accordingly, the Court must deny the Hopkins County's request for summary judgment on this claim.

## C. SHP LIABILITY

The Sixth Circuit has held that in the § 1983 context a private corporation can be liable under theories similar to municipal liability. Street v. Corrections Corp. of America, 102 F.3d 810, 818 (6th Cir. 1996). However, the same limitations apply to a § 1983 suit against a private corporation as one against a municipality, namely that there is no respondeat superior or vicarious liability. See id.

First, Plaintiff appears to assert a supervisory claim against Defendant SHP based on the theory discussed in Taylor v. Michigan Department of Corrections, 69 F.3d 76, 81 (6th Cir.

1995).  Plaintiff contends that as in <u>Taylor</u>, SHP had the responsibility to enforce, through appropriate training and supervision, policies and procedures that were intended precisely to protect someone in Butler's condition, which it failed to do.  The Court finds that Plaintiff has failed to produce evidence that SHP abandoned the specific duties of its position, providing adequate medical care to the detainees at the HCDC, in the face of actual knowledge that there was a breakdown in such care.  <u>See</u>, <u>e.g.</u>, <u>Samples v. Logan County, Ohio</u>, 2006 WL 39265, *7–8 (S.D. Ohio Jan. 6, 2006).  Plaintiff has not directed the Court to any evidence of record that demonstrates that SHP had actual knowledge that there was a breakdown in the medical care of the inmates at HCDC as a result its employees' failure to follow policies or procedures.

Second, Plaintiff contends that Defendant SHP is liable for its failure to train the LPNs at the HCDC.  Plaintiff argues that the nurses at the HCDC receive shadow training rather than specific orientation; Nurses Moss, Johnson, and Keller had not reviewed the HCDC policies and procedures; and Nurses Moss, Johnson, and Keller violated various SHP policies.  To succeed on a claim of failure to train, Plaintiff must establish (1) the SHP training program was inadequate for the tasks the nurses were required to perform; (2) the inadequacy was the result of SHP's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.  <u>Russo</u>, 953 F.2d at 1046.

While there is evidence that Nurses Moss and Keller did indeed violate at least some of the applicable SHP policies, Plaintiff has failed to present evidence that these violations were due to inadequate training of the nurses at HCDC.  The record reflects that SHP nurses are required to read its policies and procedures and to sign a document attesting that they have.  (Hairsine Dep. at 65.)  SHP has written policies regarding intoxication and withdrawal, special needs treatment plans, and practice guidelines for the management, identification, and treatment

of staph infections, suspected MRSA, and MRSA. In fact, much of Plaintiff's allegations regarding the nursing staff involve their failure to follow SHP's applicable policies and procedures. Furthermore, Plaintiff has not alleged any past instances of unconstitutional conduct by SHP employees at the HCDC. Plaintiff has not set forth any facts that there are prior instances of similar misconduct as to demonstrate that SHPS was on notice that its training and supervision with respect to medical care was deficient. See Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013). As a result, the Court finds that Plaintiff has failed to produce evidence that SHP "has failed to train its employees to handle recurring situations presenting an obvious potential for such a [constitutional] violation." Brown, 520 U.S. at 409.

Even if the Court were to assume that the LPNs' policy violations alone were sufficient to demonstrate inadequate training, Plaintiff has also failed to present evidence that this lack of training was due to SHP's deliberate indifference. Accordingly, summary judgment in favor of Defendant SHP regarding Plaintiff's failure to train claim is granted.

## II. STATE LAW CLAIMS

Plaintiff concedes that the Hopkins County is entitled to sovereign immunity on all the state law claims.

### A. Outrage

Plaintiff has alleged that each Defendant is liable for the common law tort of outrage. In Kentucky, this tort is also known as intentional infliction of emotional distress ("IIED"). See Stringer v. Wal-Mart Stores, Inc., 151 S.W.3d 781, 788 (Ky. 2004). Kentucky considers the tort of outrage to be a "gap-filler." Rigazio v. Archdiocese of Louisville, 853 S.W.2d 295, 298-99 (Ky. Ct. App. 1993). Thus, a claim of outrage is not a valid cause of action in Kentucky where the alleged conduct makes out a claim for another tort for which emotional distress damages are

available. Id.  The result is the general rule that an IIED or outrage claim cannot be pled by itself, in tandem with another tort, or in the alternative as long as some other tort with adequate relief fits the facts.  See Carter v. Porter, 617 F. Supp. 2d 514 (E.D. Ky. 2008) (dismissing IIED claim on 12(b)(6) motion because malicious prosecution claim would potentially allow damages for emotional distress); Martin v. Crall, 2007 WL 2083682, *4–5 (W.D. Ky. July 18, 2007) (dismissing IIED claim on summary judgment where plaintiff had alleged a § 1983 claim for deliberate indifference to a serious medical need which allowed damages for emotion distress); see also Taylor v. University Med. Ctr., Inc., 2005 WL 1026190, *3 (W.D. Ky. April 26, 2005) (dismissing IIED as a gap-filler tort while simultaneously granting summary judgment on all other tort claims). The sole exception to this general rule is where the alleged "actions or contact is intended only to cause extreme emotional distress in the victim."  Brewer v. Hillard, 15 S.W.3d 1, 8 (Ky. Ct. App. 1999).

In the instant case, Plaintiff has alleged claims of deliberate indifference to a serious medical need as well as negligence and gross negligence.  Because emotional distress damages are available for each of those claims, Plaintiff's outrage claim is inappropriate unless Plaintiffs can produce evidence that the Defendants took the above actions "only to cause [Butler] extreme emotional distress[.]"  Banks . Fritsch, 39 S.W.3d 474, 481 (Ky. Ct. App. March 2, 2001). Plaintiff has produced no such evidence.  Accordingly, summary judgment in favor of all Defendants as to Plaintiffs' claim of outrage is granted.

### B. Negligence and Gross Negligence

Public officers and employees enjoy qualified official immunity when they negligently perform "(1) discretionary acts or functions, i.e., those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the

scope of the employee's authority." <u>Miller v. Schrand</u>, 2013 WL 558721, *3 (Ky. Ct. App. Feb. 15, 2013)(quoting <u>Yanero v. Davis</u>, 65 S.W.3d 510, 522 (Ky. 2001)). Therefore, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Id</u>. (quoting <u>Rowan v. Sloas</u>, 201 S.W.3d 469, 475 (Ky. 2006) (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 638 (1987)).

"Discretionary acts are, generally speaking, 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" <u>Haney v. Monsky</u>, 311 S.W.3d 235, 240 (Ky. 2010) (quoting <u>Yanero</u>, 65 S.W.3d at 522). "Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." <u>Upchurch v. Clinton County.</u>, 330 S.W.2d 428, 430 (Ky. 1959). In contrast, "ministerial acts or functions—for which there are no immunity— are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" <u>Haney</u>, 311 S.W.3d at 240 (quoting <u>Yanero</u>, 65 S.W.3d at 522).

"Once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." <u>Yanero</u>, 65 S.W.3d at 523. Thus, under Kentucky law, "even if an act is discretionary, there is no immunity if it violates *constitutional*, statutory, or other clearly established rights, or if it is done willfully or maliciously with intent to harm, or if it is committed with a corrupt motive or in bad faith." <u>Autry v. Western Kentucky University</u>, 219 S.W.3d 713, 717 (Ky. 2007) (emphasis added). <u>See also</u> <u>Bryant v. Pulaski County Detention Center</u>, 330 S.W.3d 461, 466 (Ky. 2011).

This has come to be known simply as "bad faith." According to the Kentucky Supreme Court in Rowan County v. Sloas, "[a]s is most often the case, the establishment of 'bad faith' occurs upon proof of a violation of a 'clearly established right' of the plaintiff, which 'a person in the public employee's position presumptively would have known was afforded to a person in the [plaintiff's] position, *i.e.*, objective unreasonableness[.]'" Sloas, 201 S.W.3d at 481 (quoting Yanero, 65 S.W.3d at 523). See also Miller, 2013 WL 558721, *3.

### 1. SHP Defendants

Traditionally, under Kentucky law, providing medical care has been deemed a ministerial duty. "The administration of medical care is a ministerial function by employees, including doctors. Compliance with the applicable standard of care does not involve a discretionary governmental function." Gould v. O'Bannon, 770 S.W.2d 220, 221-222 (Ky. 1989). See also Blue v. Pursell, 793 S.W.2d 823, 825 (Ky. Ct. App. 1989) ("[T]he administration of medical care is a ministerial rather than a discretionary function by employees, including physicians.") Notwithstanding, even if the nurses were engaged in discretionary duties, Moss and Keller are not entitled to qualified official immunity because, as discussed above, a reasonable jury could conclude that they acted in bad faith by demonstrating deliberate indifference to Butler's medical needs. Therefore, Moss and Keller's motion for summary judgment on the negligence and gross negligence claim is denied.

With respect to Pleasant, Plaintiff has failed to demonstrate any bad faith through the deliberate indifference to Butler's medical needs on the part of Pleasant. As discussed above, Pleasant had no interaction with Butler between April 8, 2010, and April 11, 2010. In fact, she was out of town while Butler was incarcerated. Therefore, LPN Pleasant's motion for summary judgment on the negligence and gross negligence claim is granted.

Defendant SHP also requests qualified official immunity for its actions in developing and pursuing a course of action for treating the health issues of inmates at the HCDC. In <u>Autry</u>, the Kentucky Supreme Court held that a private corporation could avail itself of the defense of qualified official immunity. <u>See Autry</u>, 219 S.W.3d at 719. Furthermore, the development and implementation of policies is an inherently discretionary action. <u>See</u> <u>Williams v. Ky. Dept. of Educ.</u>, 113 S.W.3d 145, 150 (Ky. 2003) (finding the "promulgation of rules is a discretionary function"). Thus, the Court sees no reason why SHP's discretionary promulgation of policies does not entitle it to qualified official immunity in this case. Furthermore, for the reasons discussed above, the Court finds that Plaintiff failed to put forth sufficient evidence to demonstrate bad faith on the part of SHP. Accordingly, summary judgment in favor of SHP on Plaintiff's negligence and gross negligence claims is granted.

### 2. County Defendants

With respect to the County Defendants, even if the Court determines that the deputy jailer's actions were deemed discretionary, in its discussion of Plaintiff's § 1983 claim, the Court found that the facts in the light most favorable to Plaintiff demonstrated that a reasonable jury could believe that Defendants Bennett, Potocnick, Poe, and Kreitler were deliberately indifferent to Butler's serious medical needs in violation of his constitutional rights. As bad faith requires proof of a violation of a constitutional right that was clearly established at the time, the facts in the light most favorable to Plaintiff demonstrates bad faith on the part of Defendants Bennett, Potocnick, Poe, and Kreitler that negates qualified official immunity for any of their discretionary actions. In contrast, as discussed above, Plaintiff has failed to demonstrate any bad faith through the deliberate indifference to Butler's medical needs on the part of Witherspoon. Accordingly, the motion for summary judgment on the negligence and gross negligence claims

by Bennett, Potocnick, Poe, and Kreitler is denied.  The motion is granted with respect to Witherspoon.

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1.   The motion by Defendants, Southern Health Partners, Inc., Henry Davis, M.D., Candace Moss, Renee Keller, Betty Dawes, and Angela Pleasant ("SHP Defendants"), for summary judgment [DN 76] is **GRANTED IN PART AND DENIED IN PART**.  Henry Davis was dismissed by a previous order of the Court.  All Tenth Amendment, Fourteenth Amendment, and outrage claims against all Defendants are dismissed.   All claims against Defendants, Southern Health Partners, Betty Dawes, and Angela Pleasant, are dismissed.  Summary judgment is denied with respect to Plaintiff's Eighth Amendment deliberate indifference claim, negligence claim, and gross negligence claim against Candace Moss and Renee Keller.

2.   The motion by Defendants, Hopkins County, Joe Blue, Jeremy Witherspoon, Teressa Kreitler, Angela Peterson, Eric Poe, Diana Potocnick, and Jessica Bennett ("County Defendants"), in their individual and official capacities, for summary judgment [DN 77] is **GRANTED IN PART AND DENIED IN PART**. All Tenth Amendment, Fourteenth Amendment, and outrage claims against all Defendants are dismissed.  All claims against the Defendants in their official capacities are dismissed.  All claims against Defendants, Joe Blue, Jeremy Witherspoon, and Angela Peterson, are dismissed.  All state law claims against Hopkins County are dismissed. Summary judgment is denied with respect to Plaintiff's Eighth Amendment deliberate indifference claim, negligence claim, and gross negligence claim against Teressa Kreitler, Eric Poe, Diana Potocnick, and Jessica Bennett, in their individual capacity.  Likewise, summary judgment is denied with respect to Plaintiff's Eighth Amendment failure to

train claim against Hopkins County.

       3.  The motion by Plaintiff, Cindy Jimenez, Administratrix of the Estate of Tyler Butler, for a hearing on the motions for summary judgment [DN 106] is **DENIED**.

cc: counsel of record

                             **Joseph H. McKinley, Jr., Chief Judge**
                             **United States District Court**

                                 January 13, 2014